Your Honor, this is the second case of the afternoon call to the 11th, July 12th. Jeanette and Robert Vazgaitis v. Waterstone Financial and Ronald Farrah. On behalf of the, uh, on behalf of the affidavits, Ms. Andrea Zack-Zanker. On behalf of the athlete, Waterstone Financial Group, Mr. Peter Cooper. And on behalf of Ronald Farrah, Mr. Karen Kaye. All right, you will notice that we are missing a, a member. Uh, Jessica Zenoff is the third member of this particular panel. She was, uh, held up by Hurricane Sandy. She is somewhere in New York trying to get here. So, she will listen to this on the webcast or however, you know, the streaming. And she will join us in the opinion. But she's not available today. And if everyone is agreeable with that, we will certainly go ahead. And everyone's shaking their head up and down. So, I'm assuming that means yes. Your purpose is on the record. Thank you. All right, Ms. Zanker, are you ready to proceed? Do you need something before we hear it? Okay, I'll get it. Okay. Go ahead. May I speak to the court? Good afternoon, Your Honors. Um, my name is Andrea Zanker. And along with John Burke, I represent the appellants, Jeanette and Robert Rosgaitis. Your Honors, this case involves a scheme that was employed by Ronald Farrah. Who was a registered investment advisor through Waterstone Financial. And his business partner, Vicki Diggles, is soliciting Mr. and Mrs. Rosgaitis to take out a 100% mortgage on their home. In order to invest in this fraudulent plan that he represented in this investment plan. That was based on fraudulent misrepresentation. Let me ask one question. Yes. Scheme seems to be the word that has come up in this litigation. And it certainly, from your perspective, is a derogatory term, I think. What was the word or words that were used in the actual activity and execution of this event? Um, I think it was presented as an entire investment plan to our client. Um, they actually received a solicitation in the mail from Mr. Farrah and his company. Um, soliciting them to attend a seminar where they could unlock the equity in their home. Um, and so it was presented as this investment plan. Now, the lower court viewed this more as looking at the single transactions. And the separate contracts and the separate dates of purchases for these insurance and investment products. And found that the plaintiffs were time barred, um, because in Judge Ellsworth's opinion, at the time they received these contracts in November 2006 and then January 2007, they would have had everything they needed to have put them on notice, um, that they were potentially injured at that point. Um, but I think this is too narrow of a view because we're not looking at the single products here. We're looking at this entire investment plan that was presented to the plaintiffs. And it didn't begin just with the purchase of these products. The fraud actually began in soliciting them to take out this 100% mortgage on their home. And then to take these funds, um, and invest them in these products. And then the fraud continued, um, as late as August of 2008. Fraudulent misrepresentations were made, uh, to, you know, lull our clients to have a false sense of security that, uh, that the investments that they had purchased were actually providing them with the benefits that they were told they would receive from these products. What was the chronology of the event? Did the mortgage come first, then an annuity, then an insurance policy? Or how did it proceed? Um, I mean, they were kind of done in conjunction. They met with them at this seminar, I think, uh, early October. They then, our clients then met with, um, Mr. Fair and Ms. Diggles at his Waterstone office in Oak Brook. Um, at that point, I think they began the process and started to apply for certain, um, insurance products. Um, the purchases didn't come until later after, um, they had closed on the mortgage on their home. Uh, that took place, um, I believe October, early November. And then November 2006, and I don't have the exact dates in front of me, but at that point, then the purchases took place of, uh, certain products and then additional products, uh, went through in January 2007. Wasn't there an IRA that was, uh, sold as well? Yes, Your Honor. There was a Schwab IRA, uh, that was... From the United States. Yes. Um, and those funds were also invested as part of this investment scheme, um, or investment plan. And, and our position, uh, in asking this court to reverse the trial for dismissal of our claim is, first of all, our opinion, our position in the lower court as it has here has been that the two-year statute for the insurance, um, for insurance products, as well as the security clause, do not apply, or the security statute limitations do not apply, uh, to this case. And, and the basis as to why the insurance statute does not apply is it comes back to the fact that these claims are not based on the, the sale or the procurement of these insurance products. Rather, it's based on the entire fraud, which, which began with soliciting them to take out this 100% mortgage and then continued in, in getting them to invest in these products and then even after that continued to make misrepresentations as late as August 2008. So you're looking at it as that as an investment plan as a whole. As a whole. Still, if you look at it in the individual accounts, your consumer fraud is a three-year statute, isn't it? It is. And then the others are five years. Yes, it is. Um, and, and our position is no matter, no matter which statute is applied, although we don't believe the insurance or the, the security statutes apply and, and the reason being for the security is because there is no security that was sold here. Uh, section 13 specifically begins with the word every sale of a security and it goes on to set forth, um, the remedies available under that section. And so because of that, we don't believe that the security statute would apply and we would, we propose that the 13-205 and then the consumer fraud act would apply. But regardless of what the statute of limitations is, I think the problem, um, with Judge Elkner's ruling is that he erred in, erred in failing to apply the discovery rule here. Before we get to the discovery rule, assuming it, we, we're looking at a two or three or a five-year period, is there any definitive law that says you should look at the lowest, the, the shortest statute of limitations for purposes of, of proceeding because it's more fair so the parties can know how to prepare or what they need to prepare. Is there any definitive law that would say that? Um, I apologize, Your Honor. I don't have any law such as that in front of me. I know that. Well, it may not exist, but I'm asking if you're aware of it. I am not aware. I know the defendants cite to the Turganza case, um, in which the court ruled that because the case was based on the sales of the stock, um, any claims related to that could have been brought under the Securities Act should have been brought within that timeframe. Um, our position is that the Turganza case does not apply here. Uh, number one, we're not seeking a remedy that's available under the Securities Act. Number two, this is not a security that we're dealing with. Um, but regardless, like I said, even if we apply that two-year period, we believe that the discovery rule should be applied to extend the date of accrual, um, which would extend it out to February 2009 when our clients, uh, recently became aware that they had an injury and that it was wrongfully caught. And is that the occasion when they sought additional advice? It is. And it was at that point in January to February 2009 that they had made several phone calls to Mr. Fair and Ms. Diggles and were getting no responses and realized, okay, something is wrong here when my investment advisor isn't returning my calls. And so they sought independent advice and they were diligent in doing so, uh, you know, within less than a month period. Were they, were, um, the parties there and Diggles not responding because they were now gone? Is that the allegation or there was just no response? There was just no response. Um, the last responses that our clients had received were conversations with Ms. Diggles in, um, August 2008. Um, and I think earlier that year they had had, uh, conversations with Mr. Farrah. Uh, so I don't know that it's a matter that they were no longer available, but they were not responding to emails or, or phone calls to these individuals. On different documents that the parties signed, there were different types of disclaimers. Is, and, and we looked at most of those I think, and my question is, is there anything else because this record has a little volume to it, is there anything else in the record that would indicate that there, there's a document tying, well this disclaimer applies to this part of the transaction and you have to make it in stride with this part of the transaction or are they all independent disclaimers on the activities involved? I believe they are all independent disclaimers that came with the various products. Um, and, and that's the basis for our position as to, um, as to why the court erred in finding that in 2006 and as late as January 2007, when they received these disclaimers that they would have been put on notice. To find that these unsophisticated investors would be able to read these very complex contracts and know that they, um, that there was a potential fraud here, I just think defies logic and actually defies, um, you know, FINRA has actually come out and said, um, to its members, which includes Waterstone, uh, and, um, Mr. Farah, they've come out with notices saying that, um, because of the complex nature of these, uh, equity index annuities, investors really just cannot understand or, or be aware of the risk involved with, with these equity index annuities and understand the fees and the, the surrender charges and the commissions associated therewith. And FINRA has also come out and advised, um, that these 100% mortgages, um, that investors just aren't aware of the risks involved with taking out a 100% mortgage to then turn around and invest in a scheme such as this. Didn't Waterstone discourage their, um, people from being involved in a 100% mortgage? There's no allegations in our complaint that Waterstone discouraged this. And I know, um, you know, I know, but maybe I was reading that FINRA discouraged this. FINRA, FINRA discouraged its members from this and said that this would be an equitable investment. Um, but there are not allegations or I don't believe allegations that Waterstone, um, in fact, you know, our allegations are that Waterstone, um, failed to supervise its investment, um, advisor Mr. Farah and his outside business activities and then allowing him, um, to commit this or to, to solicit this type of investment plan to our, our client. So that goes to, I think your agency argument or the agency issue. We, what is the basis or what is alleged in your complaint that creates this responsibility? Well, your honor, um, as far as, and I think you're getting to the duties that Waterstone would have, um, under the securities act, Waterstone does have a duty to monitor and supervise, uh, the registered representatives that it puts out there to the public, that it holds out there to do business on their behalf. And I know Waterstone has argued that, uh, you know, plaintiffs weren't even, uh, didn't even have accounts with Waterstone. So how could, how could they owe a duty to these plaintiffs? Um, but there's case law out there and it typically comes into play, um, when courts are determining whether or not there's an arbitration agreement because of the lack of an account. And courts have said, you don't need to have an account for that person to be a customer of the broker dealer. The fact that, that the custom, uh, the fact that Mr. and Mrs. Rosaitis were dealing with, um, Mr. Fair, who was an associated person of Waterstone financial creates that relationship, um, to make them qualify as a customer. What's the difference? And you're using the word associated. What's the difference between being associated with and being an agent for or of? Well, an associated person is the term under the security back for registration of that individual, um, through FINRA. Um, and I think based on that association, uh, there is an agency relationship here. Um, but, but even without an actual agency relationship, I think there are sufficient facts. And, and this is a 2615 motion that Waterstone has brought in. And under 2615, um, you know, I think there are more than sufficient facts of an apparent agency relationship between Waterstone and defendant fair and even diggles for this, this conduct of soliciting our clients to invest in this investment plan. Um, as we've alleged, uh, during this timeframe up until December 31st, 2006, Mr. Fair, it was registered through FINRA as, um, an investment advisor and security broker through Waterstone financial, which that's the only means that made it possible for him to even, even, uh, sell investments to clients such as, uh, such as the plaintiff. Um, well, they have their own company, didn't they? They did. And, and it was a fair, they had a couple of companies, I believe, but one was fair and devil's, uh, wealth management or something along those lines. And, um, they had that company. They ran this company out of the same, um, Waterstone branch office and Waterstone was aware of this. They had a duty to be aware of that outside business activity and they allowed this to go on. And so to then say, even though we are allowing this outside business activity to take place in our Waterstone office and allowing you to come to our office and meet with Mr. Farah, who we give him business cards and signage saying he's a Waterstone representative. And then to say, you know, it's unreasonable for you to believe that he was acting as our agent. I, I just think, you know, to do that would be at the detriment of innocent third parties. I mean, our clients went there and reasonably believed that because, because of the signage, because of the business card, um, they were dealing with the Waterstone representative. And, and he was acting within what he was, um, what he was hired to do as a Waterstone investment advisor. Waterstone isn't just a brokerage firm, it's an investment advisory firm providing investment advice to clients, um, such as the plaintiff. And that's exactly what Mr. Farah was doing. And he employed Ms. Diggles. If I may conclude, um, he employed Ms. Diggles to also, uh, provide this advice and Waterstone permitted this. Um, and, and based on these reasons, Your Honor, we would ask that the court, um, reverse the lower court's, uh, finding that this is time barred and apply the discovery rule to extend a, a cruel date. And then further, um, deny the defendant's 2615 motion to dismiss because we believe sufficient facts have been stated. I do have a few questions. Sure. Um, you had indicated that FINRA warned its, its members, including Waterstone, about the, um, the, um, the cautionary language with respect to equity index. There was cautionary language on just about every investment that they, um, got involved in. Is that correct? That is correct. So how is it that they weren't given a warrant and cautioned about the, the risk of these investments? Well, the problem is, um, as this was sold to our clients as an entire investment plan, there's no way that they could have looked at any individual piece of this and been apprised of the risk. There's nothing within those documents that would, that would tell them about the risk of taking out this 100% mortgage on their home in order to invest in this plan. There's nothing in there that, that tells them, um, that they are not going to, in fact, receive the tax benefits that they have been told, um, they would receive from this plan. And most importantly, there's nothing within any of those pieces that would tell them that this package as a whole, which is so intertwined, there's nothing in there that would tell them the risk of this package as a whole. And so while, yes, there may have been cautionary language, uh, in any one product, um, our position would be that the bespeak doctrine really does not apply here because it's not narrowly tailored, um, and, and substantial enough to apprise our clients of the risk they are taking on. How about the forward looking statements that your opponents raised that, that, that if you don't have, if you have forward looking statements, you can't have a fraud. Well, actually, Your Honor, um, the Supreme Court has, has looked at the promissory fraud doctrine and, and recognize that false representations are actionable when they are intended as part of the scheme to defraud, which is exactly the case here. These, these fraudulent misrepresentations were part of, uh, the scheme to defraud our clients to take out this mortgage and then invest in these products. And, and even, even if these forward looking statements are not enough, there weren't, there are enough fraudulent misrepresentations that are alleged in this complaint that are not forward looking statements. I mean, defendants are well aware of the risks associated with taking out this 100% mortgage because they've been warned by FINRA. They're well aware of the risks associated with equity index annuities. Yet, none of this was ever explained to our clients. And I think there's enough, um, there's enough other misrepresentations and omissions to survive dismissal. I'm going to take 15. They also raised the, uh, issue of your failure to attach the documentation to your complaint. Can you address that? I can. Um, our position is that under 2606, the language of 2606 states that you have to provide, um, you have to attach the written instrument if your claim is founded upon the written instrument. And our position, um, is not that our claims are founded upon any of these written instruments. Uh, as I've said over and over, it's based on this entire investment plan and the fraud that was, uh, that was presented to our clients. Um, and the cases that are cited by the defendants, I believe are all breach of contract claims, but actually they do stem from and are founded upon that actual contract. So I think that's the difference here. We're not, our claims aren't founded upon those contracts. Our claims are founded upon the fraud in investing our clients to take out this mortgage to purchase these products. And so, um, you know, I, our position is that we were not required to attach those pursuant to 2606. And, um, you know, you're not required to attach every document that you may rely on at trial. Right. But this is, uh, based upon your argument, a series of documents that formed this, this investment plan. So what would be the harm to your client in attaching them? I guess there would be no harm. It was just our, our reading of that statute that it wasn't required to be attached as the opinion founded upon all of these documents. Um, I guess if that were the case, um, I would ask that your honors remand this, um, to allow us to attach the documents, um, at the lower court level and amend our complaint to do so. Did you ever make that request in the trial court? We did not because even though we did amend our complaint, as I said,  um, because our claims were not founded upon these documents. Nothing further. We'll have an opportunity for rebuttal if you choose to. Thank you. I understand that the concept of the time split is five and ten, five minutes and ten minutes. Who's going to start? Okay. And this is the ten minute? Yes. Okay. Thank you. You are? Um, Aaron Gay. I'm counsel for defendant, Ronald Clark. May it please the court? Counsel. By agreement, as we just explained, I'm going to utilize the first ten minutes to address primarily the statute of limitations arguments and arguments that are general to all three defendants. I just want to, for the record, state there is a third defendant, Diggles, which came up in argument. Um, I'll be arguing those, uh, those arguments on behalf of defendant Diggles as well. And then Peter Cooper, counsel for Waterstone, will be arguing the, uh, issues specific to him. Are you going to use that slide again? Okay. Um, as it relates to the circuit court's ruling, uh, that plaintiff's claims are barred by the applicable statute of limitations, there's three points I really want to make. The first is in response to plaintiff's arguments of which statute of limitations applies. It has been our position and continues to be our position that the statute of limitations, that the two-year statute of limitations under 735 ILCS 5-13 214.4, which applies to the sale and purchase of life insurance and insurance, there's no question that the transactions here, that the reason that we're here is solely related to the purchase and sale of the life, the life insurance and the annuities the plaintiff purchased. Well, but the argument is without the payment of the funds pursuant to the representations on the insurance and or the annuities, the mortgage was not properly funded. So where does the mortgage come into this? The case law is, is really more general and reads the statute to be a more general statute in that anything related to the purchase and sale of the security whether they finance that through 100% mortgage or if they had financed it through a different venue of selling other types of stock or just cash itself, anything relates to the purchase and sale of securities is governed by the statute. And the same is really true by the three-year statute of limitations that governs the sale and purchase of securities. The case law is very specific. Although it wasn't addressing the sale of stock, I started to count how many times in the record and just during oral argument, Plaintiff's counsel uses the word investment planning. The statute, the security statute defines securities to include insurance contracts. Sorry, not insurance contracts, to include investment contracts. If this is as Plaintiff pleads it to be an investment plan, we would make the argument that the statute should be read to include those. Your Honor mentioned the purchase and sale of certain, I believe it was IRAs that were sold. There were different portions of this investment that arguably fall into the sale and purchase of securities as well. But more importantly, the plaintiffs themselves have basically fled themselves into the statute by claiming that we were providing investment advice. We just heard that Waterstone only permitted FARA to provide investment advice, et cetera. They're also trying to hold Waterstone liable because under the security laws, they can't really have it both ways where they're trying to claim a scheme of an insurance plan and try to avail themselves of the security laws and then not say that the security laws by definition apply and the statute of limitations applies. Wouldn't these two people basically have to die in order to get any return on any of this investment? The way that the actual plans work are that in order for them to actually receive a recovery on the insurance plan, yes, they would have to. That's what a life insurance plan is. Right, but then they're taking money from their investments to pay for the life insurance plan. Pretty soon they have no more money left because all the money went to the life insurance plan and they're still alive. So what good does that do you when you're guaranteed you're going to get, what, like $96,000 a year and that you're going to be able to pay your mortgage off? So, I mean, it's our contention that the disclosures within the insurance plans and the annuities specifically explain and the plans specifically sign that they have read and understood these plans. But how about the guarantees made by your clients? This is going to be a quote-unquote successful plan. You know, guarantees that they're going to get so much money per year. You're going to be able to pay that mortgage off. Sounds like a scheme to me. Tell me why it is not a scheme and why it is just a gamble like any investment is. So the disclosure language, first, to address that, kind of unbundle it a little bit, the disclosure language is very specific that there are no guarantees as far as the rate of return. That is clear. Plaintiffs here have only argued and have only alleged that they could not have known this even if they had read the documents. They would not have known this. Well, even if they read the documents, you're getting from your clients that this is a good plan. You're going to get your money. You're going to get so much per month. Your clients are going to get them a subprime mortgage. They get a commission on the mortgage, don't they? They get a commission on the investment. On the closing cost, $10,400. The plaintiff pays the closing cost, but your clients get money back for the $40,000 in fees plus another $30,000 in commission on the sale of the life insurance and the mortgage. I understand what you're saying, but the issue I am facing here is how is this a typical investment when you have all of these shenanigans going on, if you will, with these people's money? I think the question isn't whether it's a typical investment or not. I think the question is whether or not the statute of limitations applies. If the statute of limitations does apply, then when does that begin to run? Whether the statute of limitations should apply, even if somebody is kind of rolling you into a bad investment plan, they know what the nature of equity and debt communities are. They use the caution, your clients, of a 100% mortgage. They're not taking their telephone calls. They're blowing smoke at these people, basically. But it's okay because we aren't going to use the discovery board. We're going to use the statute of limitations. So, therefore, any investment brokers out there can play with your money, and they're safe because there's a statute of limitations. Is that what you're saying? Well, to take each statute separately, let me take the security statute first because I think the security statute is very clear that the additional two years and let me just back up a second. The case law is clear that the discovery rule does not apply in a circumstance where the legislature is clear by including a statute of repose like what is included in the security statute of limitations. The security statute specifically includes language that says that there has to be additional two years only applies, barring the fact that you couldn't have found out this using reasonable due diligence. Well, how could they have found out about it using due diligence when they were being told by your client that everything is great and we're making money and everything is going well? Inevitably, throughout their pleadings, they basically admitted that they did not ever read these documents until they gave it to somebody else to read. They could have easily done that at the front end, and they could have said, you know, let me just wait to get a second opinion. The fact is they signed documents that said we have read these and we understand them. The point of the length of the statute of limitations and the point of the legislature saying, you know, reasonable due diligence is required is because the courts don't want, the legislature does not want to allow people to just sit there and say, well, let's see how this turns out, and if it doesn't turn out well, then I can come back and say, you know, hey, this person guaranteed me certain returns. In this particular circumstance, they had the documents. They could have read them. They acknowledged through the writings that they read them. They could have easily gone and asked for a second opinion. It's not that they could literally, you know, stick their head in the sand and say, we don't, we're just going to rely on this. I understand that they have a breach of fiduciary duty claim in there, but the statute of limitations in respect to the securities law, it's very specific that reasonable due diligence is required, and the case law really would be, really the discovery rule is the same. The case law is, and specifically with the fraudulent concealment, it does not apply if the plaintiffs have not actually, if the plaintiffs have the documents in front of them that is specifically on point and says something that has put them at least in a position where they should believe that they have a claim, and at the time that they signed these documents, they would have been on notice to know that something that either FARA or DOJ had said was contrary to what these documents said. And why would they be on notice then? Because the documents are very specific as to that there are no guaranteed rate of returns, that there are actually going to be charges if you attempt to take your money out early. These are the exact allegations. But the actual dollar amounts are noted, are they? The dollar amounts as far as how much it's going to be? Surrender charges. The surrender charges, there are calculations. The attempt is so that it can be read for a, by a layman, and, in fact, one of the plaintiffs actually made a specific determination to take the surrender charge at a longer period of time to receive a 10% bonus. That's not alleged. You can see it through the actual contract itself. But had they actually read those documents and they would have known immediately that the plaintiffs So they would have known immediately that the defendants were misrepresenting the fact to them. Exactly. Is there relief through state dispute resolution? Was there any relief? I'm not aware if there was or not. And part of the documents that they're receiving are these illustrations of what can happen. Correct. And then there's a document that they sign that says, These are, I don't want to say illustrations because that's not what they use, but these are not guarantees that this is going to happen. But this document, this illustration in particular for client, age 58, female, it's pretty significant. I mean, it stands out. And, you know, the diamonds that are sparkling from the page might make it difficult to read the rest of the documents. And these people are not, they are people who try to protect their future. They're not people who have the degrees or the skills that your clients do. Isn't that accurate? It is, but that's why the case law in the Supreme Court is very specific on it. The plaintiffs don't have to have knowledge, actual knowledge of their claims. The plaintiffs have to be on notice that they could have a claim. And, you know, I can read the exact language, I believe, from the Hermitage case, but it's very specific. I have it here, so you don't need to read it to me now. But, I mean, by the same token, these people have come, well, what you're asking us to do, if I've heard you correctly, and as I read your brief, I thought that's what you're asking us to do, you're asking us to say that maybe with a certain amount of money, although you've never identified that dollar value, but our big amount was the $216,000 or the amount that they received on the mortgage that they were going to be using. So let's say that's the amount, even though if I'm wrong. When there's that amount of money at stake, it is reasonable for Sue and Joe to go to not one, but at least two, or maybe even three investment brokers to make sure that what the first broker is saying is true. Well, I think more specifically, the case law says that if you have language that puts you on notice that you are being misrepresented to then. And where exactly is that language in anything that we can look at? Not in the case, but in the document. Well, the court's disclosure language is very specific as it relates to both the guarantees and again... Well, which one is so clear that I didn't know? So the page 1725 of the record, there's a specific disclosure that says that other than the 3% guaranteed minimum, there are no other guaranteed minimums. It says current illustrated values are based on past index performance and not intended to predict future performances. Exactly. Do you understand that? Yes. Do you think some individual who's not an investment broker would understand that? Well, later on it also says, the undersigned hereby agrees that the statements made above shall be part of the application. I understand that I am applying for an index product and that while the values of the policy may be affected by the external index policy does not directly participate in any stock, the values of the external indices do not reflect the payment of the index. I understand that the values shown, other than guaranteed minimum values, are not guarantees, promises, or warranties. I think that last sentence, which is specifically written for a layman to read, it's bolded right on top of where they sign. Wasn't it alleged that they just put these pages in front of your clients and said, sign here, sign here, sign here, sign here? It is alleged that, but the case law is very clear that a party has to read their contracts, and that's really what Judge Ellinger held. Judge Ellinger said, once you, you don't have, it's your choice if you don't read it, but if you do read it, you live with the choice of not reading the documents. But I think you're asking us to go beyond that, that when they sign those documents and they, and I'll just hold one up because, but it's not the one I was referring to. This is H-42 male tobacco. When you look at this document, you should not believe anything it says. No, I think the case law says that once you have disclosures that are specifically contradicting what was said, then you're on notice that you could have a claim, and that's why the statute of limitations begins to recruit at that time. And if, as alleged, defendant Farah and defendant Giggles told them, you have guaranteed returns and there is nothing, you are not going to have fees when you pull this money out of these. And then you read that language that says these are not guaranteed returns. You don't have to read or understand anything else. All you have to understand there is I just didn't like it. Well, yeah, isn't that fraud? As alleged, arguably, that would be fraud. Not that I want to concede that that is fraud, but what I'm conceding here is that that would put you on notice that you have a claim, and that's why the statute of limitations would begin to recruit the moment you have these documents. So every time somebody buys insurance and they also receive this little illustration that goes with the whole plan, that this is a lie, it should be assumed that this is a lie, and you understand that. No, the comment and the language here is to prevent and if you don't acknowledge this language, you're essentially saying there is no point ever to having disclosure language in the contracts, and the case law does not state that. The case law says when you have disclosure language that is contrary to specific misrepresentations, that puts you on notice. The illustrations that are provided within there would arguably, you know, be that these are what could potentially be your returns on the investment, and that's what the disclosure language says. Well, why doesn't it just say right above their signature, I'm lying, don't believe a thing I said? Well, it's only as plaintiff has alleged that defendant Farah and defendant Biggles have said, these are guaranteed returns, and these illustrations, the illustrations that are within these are guaranteed returns. Well, if they're saying that, then isn't that enough to get you passed, to get you to the jury? No. Is that a question of fact, whether or not they're telling the truth, or whether they're telling the truth? I believe that the Supreme Court has said that when it is clear, you can decide the discovery rule issue at the motion of dismissal stage, and that's what the court there did. There are circumstances where it is possible that it's a question of fact, that we do not believe it's a question of fact. But if we get passed the statute of limitations, it's a question of fact, correct? If you get it. Say, for instance, we disagree with a judge who is a counselor, and determine that the statute, that the discovery rule applies, and determine that they're within the statute of limitations, then we are with a charge of fact, and then they make a determination as to who was telling the truth, correct? Then they make a determination as to who was telling the truth. It's a question of fact. We were just saying that. Yeah, I mean, the discovery rule can be a, whether or not plans were on notice, can be a question of fact. And the courts, Hermitage and other courts, have held that when it is clear there are no questions of fact, then the courts can decide it at the motion of dismissal stage. Here, it's plaintiff's burden to prove, or to plead, I should say, the discovery rule applies here. That's what I'm saying. If we find that the discovery rule applies, you were saying, well, they're just saying that. That's what they're saying. I'm saying if we find that the discovery rule applies, then it goes back to the trial court, and the jury determines who's telling the truth, whether it's Diggles and Farrell or whether it's the plaintiff. That would really go to our secondary argument, which is related to the fact that the cautionary language negates their claim. The question of fact related to the discovery rule is one issue, but we do make the secondary argument that this particular language here is clear enough and is specific enough to allow the court to dismiss these claims as negated. Regardless of FINRA saying to them, hey, watch out for these cautionary language because it's confusing. The allegation is that FINRA said that the 100% mortgages of these products are not necessarily reliable, but that's the purpose of the disclosures. The disclosures are there in order to inform the plaintiffs of that exact fact. They said in 2005, FINRA to Waterstone and Farrell, you better watch out because customers might not understand the complex nature of these equity index annuities or features such as fees, expenses, and surrender charges. They were basically discouraging the 100% mortgages. They were also discouraging equity index annuities, correct? I haven't read the entire FINRA disclosure, admittedly, but I think that the FINRA disclosure relating to these products is exactly why companies have the disclosure language in their contracts because if plaintiffs do have questions about the products, then they can say, hey, I don't really understand this. I really don't understand why this 100% mortgage works. I don't understand why this scheme, so to speak, works, this investment plan works. And the cases that plaintiffs do actually support that. I believe that the one case the plaintiff really relies on most heavily, I'm not sure how to pronounce the exact name, the Olcic case, specifically cites the ad litter and distinguishes between a plaintiff who doesn't have language in their agreement that puts them on notice, so to speak, of the election certifications and somebody who does. And in Olcic, there was one plaintiff where the court said the insurance agreements do not put you on notice of that because there is no language that specifically objects at that point. But there was a plaintiff where there was an assigned claim, and the court said, you know, like in ad litter, where you have disclosure language that is specific to that and contrary to the misrepresentations that were allegedly made, then the court can say, you know, these are not material, it is not reasonable to rely on these misrepresentations. And so then the binder that they gave them that promised them guaranteed benefits that would result in hundreds of thousands of dollars, they should have heeded the warning of what was in that binder. Yes, I mean, ad litter holds that way, other courts hold that way, that once you have language in the agreement that specifically says, you know, this is contrary to what you've just misrepresented, then you are on notice of that. And you cannot material, they're not material misrepresentations, and you can't rely on that. It's not reasonable to rely on those statements. One of the cases you rely on is the Lagan versus Balfour, which I have some familiarity with. And those particular statements that ultimately won the day are very different than the ones in these agreements, aren't they? I have not actually compared them, but yes, I mean, based on the opinion, it appears that they are slightly different. It says that these tables that have been presented, it specifically identifies each area that they looked at, tells them that they're leveraged, that, you know, these things, gives them all the facts. And you've told me where your disclaimers are, but isn't there a significant difference in the two? I would argue not. I would argue that these are clear enough that, I mean, that's been our position the entire time. Certainly, as it relates to the guaranteed rates, the language is very clear. It's right there. It's in bold. And relating to the surrender charges, you know, the plaintiff here, in fact, actually made an election here as it relates to the surrender charges. Well, and then the question is back. Wouldn't you take a 10% bonus than a 10% dip? Just a thought. You don't need to answer that one. Do you have any other questions? I have nothing. Okay, counsel, if you want to summarize, and then we'll let your colleague come forward. Sure. So, just in conclusion, it is all of the defendants. We appeal to the court to affirm the certain court's decision, and although the statute of limitations does bar the claims here, and in the alternative, if the court doesn't believe the statute of limitations bars, then at least the cautionary language that was provided in the agreements should bar the fraud claims, as they were not material, and there's no reason that they could reasonably have relied on it. The other arguments, obviously, are in our briefs,  Thank you. Thank you. And Mr. Cooper, then, from Waterstone rather than Weatherstone. Well, you said Weatherstone. Your Honor, I'm willing to represent them both if there is any other discussion. I thought we had another partner in this case. We're willing to assign a liability to Weatherstone. Your Honor, thank you. Thank you very much. My name is Peter Cooper. I represent the defendant, Waterstone. While I'm going to primarily discuss some of the issues of agency, which you raised earlier, I did want to just address a couple of issues that Your Honor has asked my colleague before. The first issue I want to make clear that we all understand, the term investment advisor is actually a term of argument defined by federal securities law. An investment advisor is something that is governed by the Advisors Act of 1940. It's an it, it's not a he or she, but it's an entity that gives certain services as defined by investment advisors. Amongst those services is not the sale of insurance. The use of the term investment advisor does not make, the fact that Waterstone was a registered investment advisor, does not make it an insurance sales entity. And the fact that Mr. Ferrer was an insurance salesman and authorized to sell insurance under certain entities, or that Ms. Vigils was an insurance salesperson, does not mean the fact that Waterstone was an investment advisor, that in fact the investment advisor sold these policies of insurance. That the investment advisor what? Sold these policies of insurance. So I just want to make clear, the way plaintiffs talk here in appellate talk, they use the term investment advisor to be equivalent to a certified financial planner, and they're not the same thing. An investment advisory is an it, it renders certain services, the sale of insurance, at least not these policies, wasn't one of them. Another question that came up. So were they financial planners associated? Your Honor, I don't know if they were financial planners or not. I know that Mr. Ferrer, Mr. Ferrer only, was a registered representative who was authorized to sell securities, securities being stocks, bonds, from, through Waterstone. These aren't stocks and bonds, and he didn't sell them. Ms. Vigils, who has no affiliation with Waterstone, was the only person who sold anything. Your Honor, you also asked a question concerning insurance, and I think there is again some misconception about how insurance operated. And I know this only from looking at the pleadings before me, and not anything else in terms of the nature. But these are universal life policies. Universal life policies, you can begin to access the income and the assets within the universal life policy after the vesting period. So it's not true that, gee, once a universal life, there was a deposit or premium paid through universal life policy, that everything is locked up until death. That's not the way universal life operates. Well, you're not going to make any money, get any investment or any return on your investment until you die. I mean, if you're taking the money out and the policy is not earning the money, it's just as good as sitting in your equity in your home as it was sitting in some policy. Your Honor, in all deference, and again, I'm not familiar with these particular policies. My understanding of universal life policies in general is that, in fact, you can begin to access some of what is known as inside approval, that you can begin to access it either through withdrawals or borrowing. I don't know the terms of these specific policies, and I can't help you. And if there wasn't an income or accrual, they were taking in each year and paying in on the next year policy for each of the husband and wife. Your Honor, I can't talk about the operation of these specific policies. So why are you talking about those policies when they really don't have any relevance? Because, Your Honor, there was some confusion, but I think Your Honor asked, is it true that these could not have been accessed until their death? And the answer is, having looked at the record before you, I do not believe that's a fair characterization, and I wanted to make sure there wasn't. Justice Hutchinson, you asked a question about agency. You asked a basic question about agency. Let's just start with those issues. Let's start with the simple, undeniable fact that Ms. Vigils was never an agent of Waterstone. The record is clear that she was affiliated with a different broker-dealer. I refer you to Exhibit D of our motion to dismiss. I believe that it's page 268 begins with page 2680 of the record, although I don't have the record in front of me. Exhibit D was a public record that Ms. Vigils was never affiliated with Waterstone. I also direct Your Honor's to a portion of the pleadings, and I believe that begins at page 1719, which shows all of the actions taken were taken by Ms. Vigils. Ms. Vigils was never an agent. Now let's get to a different issue with respect to Mr. Farrell and his agency. He was a registered representative until December of 2006, authorized to do specific things to sell securities on behalf of Waterstone. He was not authorized to sell these policies of insurance on behalf of Waterstone, nor is there any allegation against him. There are two sorts of authority. There's either actual authority, which can be either explicit. There's no allegation anywhere that he was explicitly authorized to sell these policies of insurance. May I finish, Your Honor? It can be implicit. You can say, well, it was created. So he had authority to sell stocks and bonds. Stocks and bonds only. That's correct, Your Honor. From my time. Correct, correct. But how about that he had authority through Waterstone to take and sell other people's stocks and bonds in exchange for investing in stocks and bonds that he then purchases? I mean, Your Honor, I'm not sure. When he took the S&P and sold it. Or when he took the other account and sold it. Certainly he had authority to execute transactions in securities. And that might be a sale of a, well, the interest, he could not execute, for example, he could not place the order to sell, to liquidate the Charles Schwab account. Why? Because only somebody who is registered representative of Charles Schwab can place that order. The only thing that Mr. Farrah can do is he can access accounts that are held at Waterstone. He can buy and sell securities at Waterstone. Now, the securities transferred over to Waterstone from Charles Schwab, he can sell that at Waterstone. He cannot place an order at Charles Schwab and say sell this by that. His customer can. He cannot. At his direction? Correct? Not certainly. Customers can do it at any suggestion. They can do it at the suggestion of their brother-in-law. They can do it at the advice of their visitor. Well, we don't have a brother-in-law before us, counsel. We have your client and two individuals before us. And it was their investment plan, if you will, that they suggested that you sell the IRA and that they sell the S&P in order to invest at their direction. Isn't that correct? Allegedly, Mr. Farrah, again, Ms. Diggles is not our agent, but my understanding is, in fact, that advice came from Mr. Farrah and Ms. Diggles to liquidate those positions. That's correct. Ms. Diggles, as you've indicated, did the actual execution of the plan. He proposed the plan, or at least the way you're presenting it, but he never did anything. Diggles did it all. That's what I understand the allegations and what the evidence of the record is, Your Honor. And, again, when I want to come back to the allegations of agency, and, Justice Hutchinson, I think you said what happened. The two allegations of agency, really, with respect to Waterstone, are that Mr. Farrah had a branch office, a Waterstone branch office. Your Honor, that's a term for, in order to sell securities, you can only sell it at a branch office. You can't sell it out of your, your bedroom becomes a branch office if you're selling securities. Well, I suppose if your bedroom has the Waterstone plaque up, that might become your office. But was there something in that office, other than the register on the outside of the building, or once you walk in, you find the office, that said Waterstone Financial? I don't know if I saw that in the pleadings, Your Honor. And since Mr. Farrah stopped being affiliated with Waterstone after 2006, I just don't have any knowledge. Let me ask one question about 2006. Is there a date, because we have transactions going on here in 2006, as I recall. So, at what date was this relationship ended? Again, Your Honor, December 1, 2006. And if you look again at Exhibit D to our motion to dismiss, that is the broker check, the broker check, the broker check from FINRA, which is a securities entity, requires every registered representative to have information about them on file, electronically available to the public, and that discloses that he ceased being a registered representative with Waterstone on December 31, 2006. It also discloses that Mr. Diggles was never affiliated with Waterstone. With respect to business cards, Your Honor, I've read that thing, that it was a business card. I haven't seen this business card. But significantly, Your Honor, the pleading doesn't allege that the plaintiffs ever saw the business card. The pleading doesn't allege that the plaintiffs ever saw Waterstone. The pleading alleges nothing about a reliance upon Waterstone. Your Honor, I suggest the case law is very clear that if you're going to argue some sort of apparent agency, you have to argue both justifiable and reliance. I suggest that you, Your Honor, suspect the language of Petrovich and Weill both establish that there needs to be that reliance. And again, Your Honor, I may have missed it, and this is a very long complaint, but I see the allegations of reliance. I see that basically we have Mr. Farah is selling securities under or selling stocks and bonds under the name Waterstone, and therefore Waterstone should be responsible for everything that happened by anybody, and that's not what the law holds. And, Your Honor, I do want to come back very briefly to the issue about the Illinois Securities Law, because that does affect this. The Illinois Securities Law was passed by the legislature, and the legislature, in its wisdom, you have three years from the activity to commence your action, and there is no discovery rule. Plaintiffs have argued this is all covered by FIDMA, by securities regulations, by the rules of the NESD. They argue that these are securities for purposes of duty and what information. Justice Shostak, you pointed out that, in fact, you quoted, I think, from something that you said was sent by FIDMA. If these are securities, the legislation cannot be clearer that they are barred by the three-year statute of repose set in the Securities Act. Your Honor, with all due respect, the Waterstone is truly a stranger to this action. They were not involved in any of the transactions, so excuse me, no money from any of the transactions. They are here just because they're the deep pocket. We submit that Justice Holzman correctly dismissed it on the basis of statutes of limitation, but even if Your Honor has overturned that, Waterstone should be dismissed because they are not responsible for any of the allegations contained in the complaint. Thank you. Ms. Nathan? Your Honor, I would like to begin by addressing some points that were made by Mr. Cooper in regard to Waterstone Financial. First of all, his allegations that Mr. Fair was not authorized to sell insurance, that's an allegation that's going beyond the facts of the complaint. What we've alleged is they put him out there with the ability to buy and sell investment products, which would include insurance and equity and extenuity. In fact, we have alleged, and I know they say they aren't in the business of selling insurance, but they represented to the SEC in forms that they have to file that their business activity includes, among those, insurance company or agency, and that's on page 1402 of the common law record. It also discusses their advisory services that they provide, which is financial planning services, portfolio management, furnishing advice to clients on matters not involving securities, and that is exactly what we've got here. So to sit here and say that Mr. Fair was not authorized to do these exact things that he was doing, I think it's a disingenuous argument, and as I said, I think it goes beyond the facts, and as we're looking at this as a 615, I think any argument that he's not authorized to sell insurance should be ignored for purposes of the 615 argument. What about the issue that, in fact, he didn't do any of the sale work, although it's hard to read whose signature is on some of these documents, but it would appear to be sales. If she actually executed everything, what, if any, connection does she have to Waterstone? I think the problem that Waterstone has is that they allowed her to work out of this Waterstone branch office. They were well aware, or at least they should have been, of his outside business activities, which included his company that was called Farrah and Diggles Wealth Management. I mean, if you know that someone's running a company called Farrah and Diggles, and that Diggles is an unregistered or not registered with your firm, they actually have a duty to register people who are working at their branch office, and actually there's allegations in our complaint that Ms. Diggles was, at least the complaint had been made in regard to her sales of security, and this would have put them on notice that they should have been supervising this. They had a duty to supervise this outside business activity, and I think by allowing her to conduct her business with Mr. Fair, I mean, to say that he, just because he didn't sign his name on these products, that they wouldn't be responsible, I mean, he solicited these clients. Let's talk about that in particular. Yes. What, where on this solicitation was there a little Waterstone, you know, affiliated with Waterstone Financial, or was there anything like that on the document? Your Honor, I apologize. I don't have a copy of the document here, but our clients, they have a business card of his, referring to him as a registered representative of Waterstone Financial, and they went to his office, which is a Waterstone Financial office with signage of such, and I think that would have, as any investor going into this, that would, it would be reasonable for them to believe that they were dealing with a Waterstone, a registered investor. You know, I think there are allegations that they dealt with him because they knew that he was registered and affiliated. It's not like they would have just gone to deal with Joe Schmuel off the street to invest their $280,000 that they just took out of their house. Are there any documents that they actually signed indicating Waterstone Financial Group was part of this transaction? Most of what I see, or have seen, are Midland National Life Insurance Company. That is correct, Your Honor. The documents that they signed that were actually sold to them are not Waterstone, or they don't indicate that they are Waterstone products, but that does not alleviate Waterstone's duty to supervise Farrah and his outside business activities, and I think this goes back to the recent, you know, it goes back to the apparent agency and the reasonableness of our client's belief that they were interacting with a Waterstone agent when they deposited their money in this investment plan. Did they get monthly statements? I believe because the insurance products, they were yearly statements, so it wouldn't have been until a year later that they would have even seen what the value was in these investments. So, no, they did not receive monthly statements. Your Honor, if I may just briefly also address Mr. Key's arguments in regard to the guarantees that were contained in those documents that they did receive in 2006. You know, I think, as we said, there's nothing in those documents that would directly contradict what our clients were told, and, you know, Your Honor, as you stated, I mean, they might as well have written on there, I am lying, because what Judge Elkner's ruling means is that you basically have to assume that this person you are dealing with to provide you this expertise is lying to you and then go out and obtain outside expert opinion as to the purchases you just made, and I don't think that that is what's required here. You know, they were under an obligation to disclose the facts to our clients, and they did not do so, and I don't think that the generic cautionary language in these policies would have put our clients on notice that they had a problem. And because of this, you know, we would ask that Your Honor apply the discovery rule to this case and extend the statute of limitations and further deny Waterstone's 2615 motion to dismiss, because I think there are sufficient facts of apparent agency. I know that you've looked at the Langdon case, and you talked about it, Langdon v. Elkner. There, this court found that there were maybe sufficient cautionary language, sufficient disclaimers. Have you done any comparison of those disclaimers and the disclaimers that your client signed underneath? I can't say that I have done a side-by-side comparison of the cautionary language. However, my reading of the Langdon case, you were dealing with impending issues or future promises, and as I argued earlier, this case is not just about future promises. There were risks that were known to Farah and Diggles at the time they solicited our clients that were never informed to our clients in regard to this 100% mortgage and in regard to these equity index annuities, and there's nothing in those documents, nothing in that cautionary language that would have put them on notice that there was a problem with this entire investment plan. And because of that, Your Honors, we would ask that you reverse the trial court's dismissal of our claim and remand the trial court. I have just one quick question. Your opponent indicates that based upon Illinois security laws, we cannot go outside of that three-year statute as a fellow. You're asking us to apply the discovery rule. How do we get around that? Well, Your Honor, the section that they're referring to actually has its own built-in discovery rule. So in paragraph 2 of that section, 13B, it says that if data on which a party bringing the action has noticed this effect, which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this act, but in no event to extend it more than two years beyond the three years, so for a total of five years. And so even if Your Honors find that the Security Act applies to this investment plan, the complaint was filed well within the timeframe of the five years. And so I think reversal would still be proper. Thank you, Counselor, for a very interesting argument. Gentlemen, thanks for doing that in the afternoon. It was lively, and we will render a decision in due course. We now stand adjourned.